## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

   v.

BENJAMIN BALLOUT,
MOHAMED ZAYED, and
WILLIAM FIELDING,

            Defendants.

Civ. Action No. 9:24-cv-81170

**JURY TRIAL DEMANDED**

## COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against Benjamin Ballout ("**Ballout**"), Mohamed Zayed ("**Zayed**"), and William Fielding ("**Fielding**") (collectively, "**Defendants**"), and alleges as follows:

### I.    SUMMARY

1.    Defendants engaged in a fraudulent scheme to pump and dump the publicly traded stock of Enerkon Solar International, Inc. ("**Enerkon**"). As the sole officer and controlling shareholder of Enerkon, Ballout schemed to inflate Enerkon's stock price primarily through false and misleading statements and omissions in its public statements and disclosures to investors. With the help of Ballout, Fielding and Zayed then profited from the scheme through the conversion of a bogus promissory note into Enerkon stock, which they sold to a third party at inflated prices.

2.    Ballout acquired a controlling interest in Enerkon in or around February 2018, and thereafter became Enerkon's sole officer. Enerkon was a penny-stock company that had no employees (aside from Ballout) or legitimate business operations. Ballout made a series of false

and misleading statements and omissions to pump Enerkon's stock price, including misstatements and omissions about Enerkon's supposed business opportunities, assets, and liabilities.

3.      For example, in 2021, Ballout authored and issued three press releases falsely claiming that Enerkon: (1) acquired a company with distribution rights to a Covid-19 instant test, (2) received a $28 million order for the tests, and (3) purchased 122 acres in Pennsylvania to build a power plant. Zayed, who had a longstanding relationship with Ballout, fabricated a bogus purchase order purporting to evidence the $28 million order. On June 22, 2021, based on these press releases and questions concerning the accuracy of other public statements or disclosures that Enerkon made to investors, the SEC temporarily suspended trading in Enerkon's securities.

4.      Prior to the trading suspension, Fielding and Zayed coordinated with Ballout to capitalize on the inflated price of Enerkon's stock. They did so through a convertible promissory note that Enerkon issued to Fielding as purported consideration for a $180,000 loan. In reality, Fielding never made a $180,000 loan to Enerkon, and the note was backdated to November 2017 and signed by Ballout, even though he had no affiliation with Enerkon in November 2017. In March 2021, Enerkon's transfer agent received an email from Fielding's email account, instructing the transfer agent to convert the bogus promissory note into Enerkon stock. The email attached a fabricated Fielding bank account statement and other false records, purporting to evidence his alleged $180,000 loan. Relying on these false documents, the transfer agent issued Enerkon stock to Fielding as instructed. In transactions coordinated and negotiated on his behalf by Zayed and Ballout, Fielding then sold a portion of his Enerkon shares to a third-party investor for $407,000. Fielding later paid $96,000 of the trading profits to Zayed for his role in the fraudulent scheme.

5.      By engaging in the acts and conduct alleged herein, Defendants violated the antifraud provisions of the federal securities laws. In the interest of protecting the public from

further violations and enforcing the federal securities laws, the SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties, and all other equitable and ancillary relief the Court deems necessary and proper.

## II.     JURISDICTION AND VENUE

6.      The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933 ("**Securities Act**") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("**Exchange Act**") [15 U.S.C. §§ 78u(d) and 78u(e)].

7.      This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa]. Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

8.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times, Fielding resided in this District during the course of the relevant events in this case. In addition, Fielding served as the registered agent of Enerkon, at an address in this District, during at least part of the relevant events in this case. The false and misleading statements and omissions in Enerkon's press releases and public disclosures alleged herein were published to investors in this District.

### III.   DEFENDANTS

9.      Defendant Ballout is a resident of Canton, Michigan. Between February 2018 and October 6, 2022, he was the President, Chief Executive Officer ("**CEO**"), and Chief Financial Officer ("**CFO**") of Enerkon, as well as a member of its Board of Directors.

10.     Defendant Zayed is a citizen and resident of Egypt. In 1997, Zayed was indicted by a federal grand jury for wire fraud, scheme to defraud, and money laundering, and a warrant was issued for his arrest. *See United States v. Zayed*, No. 1:97-CR-0039 (E.D. Tenn.). In 1998, the SEC sued Zayed for securities fraud in connection with the promotion and sale of the stock of Genesis International Financial Services, Inc., alleging that he used fraudulent financial statements and press releases to deceive prospective investors. *See SEC v. Zayed*, No. 1:98-CV-327 (E.D. Tenn.); SEC Lit. Release No. 15907 (Sept. 24, 1998). The SEC was not able to serve Zayed with that lawsuit and subsequently dismissed its claims against Zayed without prejudice.

11.     Defendant Fielding is a resident of Delray Beach, Florida. He was formerly the registered agent of Enerkon, including during at least part of the relevant events discussed herein.

### IV.   RELATED ENTITY

12.     Enerkon was a Nevada corporation with its principal place of business in New York, New York. Its common stock was quoted and traded on over-the-counter ("**OTC**") markets under the symbol "ENKS." It published OTC Disclosure Statements and OTC Financial Reports pursuant to the Pink Basic Disclosure Guidelines through a publicly available website maintained by OTC Markets Group, Inc. On June 22, 2021, the SEC suspended trading in Enerkon's securities pursuant to Section 12(k) of the Securities Act. On or about October 6, 2022, Enerkon was sold to new investors who subsequently renamed it and put in new management.

V.   <u>FACTS</u>

**A. Defendants and Enerkon**

13.     Ballout became Enerkon's President, CEO, and CFO in or around February 8, 2018, after acquiring a controlling interest in the company from its prior owner, and he remained its sole officer until approximately October 6, 2022. Between February 2018 and October 2022, Ballout drafted Enerkon's press releases and had sole authority to approve them. He also drafted and approved all of Enerkon's OTC Disclosures, OTC Financial Reports, and other public filings.

14.     Fielding and Zayed have a longstanding business relationship through a company that they jointly own that focuses on defense/security in the Middle East. Through that work and before Ballout acquired a controlling interest in Enerkon, Fielding and Zayed met and developed a relationship with Ballout, who was also working in the defense/security industry at the time.

15.     Subsequently, Fielding and Zayed became involved in Enerkon, with Zayed acting in an unofficial role and Fielding serving as its registered agent. Fielding also purported to be Enerkon's lender and shareholder through a bogus promissory note that he converted to shares of Enerkon, as further discussed below.

16.     Informally, Fielding let Ballout and Zayed use his credit cards to pay miscellaneous expenses for Enerkon, including Enerkon expenses relating to OTC administrative fees, publishing press releases, domain hosting fees, and other similar charges. These charges were typically in the range of $2,000–$3,000 per month, and were commingled with charges that Fielding, Ballout, or Zayed made on the same credit cards for expenses unrelated to Enerkon. Fielding testified that he was reimbursed for some of these monthly charges relating to Enerkon, but not all. It does not appear that Enerkon contemporaneously or formally: (i) accounted in its books and records for the expenses that were paid for with Fielding's credit cards; or (ii) disclosed these expenses in its OTC Disclosures, OTC Financial Statements, or other public disclosures.

5

**B. Ballout Made a Series of False and Misleading Statements and Omissions to Investors in Furtherance of His Scheme to Inflate Enerkon's Stock Price.**

17.     Shortly after acquiring a controlling interest in Enerkon in February 2018 and continuing until the SEC suspended trading in Enerkon's securities on June 22, 2021, Ballout knowingly or severely recklessly engaged in a scheme to inflate the price of Enerkon's publicly traded stock. He sought to accomplish this scheme primarily through false and misleading statements and omissions in Enerkon's press releases and public filings—all of which he authored and approved as the sole officer of Enerkon. These false and misleading statements and omissions created false and misleading impressions about Enerkon's supposed business opportunities, assets, and liabilities.

*i.  Ballout's Scheme to Pump Enerkon's Stock Price*

18.     As the controlling shareholder in Enerkon, Ballout had a strong financial motivation to pump Enerkon's stock price. During the course of his scheme, Ballout owned 33 million shares of Enerkon stock, more than 50% of its outstanding stock. By increasing the value of Enerkon stock, he stood to make a significant profit through the eventual sale of his shares.

19.     However, Enerkon was not engaged in any known profit-generating business. At all relevant times, Enerkon's bank account had less than $100. And following Ballout's acquisition of Enerkon, he relied on Fielding's personal credit card to help fund Enerkon's operating expenses.

20.     Rather than work to improve Enerkon's business or to enhance its underlying financial value, Ballout developed and implemented a scheme to artificially inflate the price of Enerkon's stock. To that end, by at least early 2021, Ballout touted plans to increase Enerkon's stock price above $4.00 per share to qualify for listing on the Nasdaq stock exchange. In a March 2021 press release, for example, Ballout cited the company's continued plans to qualify for trading on Nasdaq. In another press release dated May 20, 2021, Ballout again cited Enerkon's "UP List

Plans to the NASDAQ market which maintains a minimum share entry price of $4.00 to qualify for listing on the national exchange."

21.     Ballout's scheme, however, was foiled when the SEC suspended trading in Enerkon's securities on June 22, 2021. According to the SEC's Press Release dated June 22, 2021, the temporary suspension was "due to, among other things, lack of adequate and accurate information in Enerkon's quarterly and annual financials" and questions regarding "the accuracy and adequacy of publicly disseminated information in press releases," including the three press releases discussed further below. Before the SEC suspended trading, Ballout knowingly or severely recklessly made materially false statements and omissions and engaged in deceptive acts in furtherance of his scheme, including but not limited to the examples discussed below.

##### ii. *Ballout Made False and Misleading Statements and Omissions in Enerkon's Press Releases Concerning Supposed Business Opportunities Arising from a Covid-19 Test Device.*

22.     On March 9, 2021, Enerkon issued a press release, which Ballout authored and approved. The press release touted Enerkon's purported partial acquisition of a U.K. corporation based in London, England (the "**Agent**"). It also discussed a Covid-19 test device manufactured by a Canadian company (the "**Manufacturer**"), and for which another Canadian company held exclusive distribution rights (the "**Distributor**"). In relevant part, the press release stated:

> We are pleased to announce that we have completed the initial acquisition of [Agent] whereby a 40% stake was acquired and an additional 60% is expected to be acquired additionally in the coming week . . . [Agent] owns distribution rights to a new COVID-19 Test Device, produced by [Manufacturer] and [Distributor], which is a rapid (15 seconds) Test Device . . .

23.     In reality, the Agent did not own distribution rights to the Covid-19 test device referenced in the March 9, 2021 press release. In late 2020, Agent entered a sales-representative agreement with the Distributor, the master distributor of products manufactured by the

Manufacturer. But that agreement did not give Agent any distribution rights to those products. A subsequent Memorandum of Understanding dated January 24, 2021, between Distributor and Agent also made clear that Agent did not own distribution rights.

24.     Distributor's executives also expressly informed Ballout and Zayed that Agent did not own any distribution rights to the Covid-19 test. Upon learning of the March 9, 2021 press release, a Distributor executive sent an email on or around March 17, 2021 to Ballout, copying Zayed, expressly informing him:

> Unfortunately, the information you are sending out in the public to raise funds and awareness is completely false. We have entertained discussions with [Agent] to eventually become a sub-distributor of [Distributor] for the sale and distribution of various products and services for which we hold the rights through proper and legal contracts with the patent holder [Manufacturer]. To date no firm contract has been finalized or even less signed. Your website is advertising false and misleading information. [Agent] does not own the distribution rights to the [Covid-19] insta-test and does not have any formal rights whatsoever at this time. Because of this I insist you remove all mention of [Distributor] and reference covid [sic] testing referring to our companies.

25.     Ballout knew, or was severely reckless in not knowing, that the statement in the March 9, 2021 press release that "[Agent] owns distribution rights to a new COVID-19 Test Device, produced by [a Canadian manufacturer] and [Distributor]" was false or misleading at the time it was made. Also, based on the email the March 17, 2021 email from the Distributor executive, Ballout knew or was severely reckless in not knowing that this statement in the March 9, 2021 press release was false or misleading at the time it was made. Yet, Ballout never disclosed any of the facts in the March 17, 2021 email quoted above, and never disclosed the fact that the Distributor contacted Enerkon demanding that it take down the false and misleading statements about Agent's supposed distribution rights.

26.     On May 11, 2021, Enerkon issued another press release—which Ballout authored and approved—that contained false and misleading statements and omissions concerning a fabricated order for the Covid-19 test.

27.     In relevant part, the May 11, 2021 press release stated that Enerkon "announce[d] today its first Contingent Order for the SARS2 COVID19 15 second 'Insta Test' as produced by [Manufacturer] with Co sales via [Distributor] and [Agent] (an [Enerkon] wholly owned division)." The release quoted Ballout as saying that the "'order was placed by an NGO operating in the Dominican Republic from a Major Medical Foundation'" and was valued at "'$28,000,000 per month'" or "'$320 Million annually.'" The release further quoted Ballout as saying that the order was "'a great start for the new company acquisition of [Agent] and its Co Sales Partner [Distributor] in Canada, the main distributor with [Manufacturer].'"

28.     As an initial matter, the May 11, 2021 press release was false or misleading, because Ballout knowingly or severely recklessly failed to disclose the facts discussed in paragraphs 22-25 above, including that Agent lacked distribution rights to the Covid 19 test, that Distributor sent him the March 17, 2021 email described in paragraph 24 above, or any of the material facts stated in that March 17, 2021 email.

29.     Further, the May 11, 2021 press release was false, because there was no multi-million-dollar order for the Covid-19 test or, for that matter, any order at all.  On April 14, 2021, Zayed received an email at his email address from an email address associated with a purported non-governmental organization operating in the Dominican Republic (the "**NGO**"). The email attached a letter of interest ("**LOI**"), dated April 15, 2021, purportedly from the director of the NGO. The LOI contained a purchase order for Covid-19 tests matching the description in Enerkon's May 11, 2021 press release.

30.     The LOI showed that it had been copied to Zayed and listed a website purportedly associated with the NGO. Records from the website's domain hosts, however, show that this website has not been linked to any entity called by the given name of the NGO. Instead, these records list Zayed and Fielding as the contacts for the NGO website and show Fielding's credit card as the payment method. Therefore, the reasonable inference is that Zayed fabricated the LOI and purchase order, then sent an email from the NGO email address (that he controlled) to himself with the fake LOI and purchase order on April 14, 2021. Zayed then forwarded the email and LOI he purportedly received from the NGO to the Distributor.

31.     After receiving the fake LOI, the Distributor never accepted the supposed order referenced in the press release. Because Distributor never accepted the order, the order could never generate any revenue even if it was legitimate (which it was not).

32.     Ballout authored and authorized the press release, which referenced the fake purchase order that he had no way of knowing about other than through Zayed, with whom he had a longstanding relationship that pre-dated Enerkon. Ballout also had access and authority to use Fielding's credit card that was used to pay for the website associated with the NGO. Ballout knew or was severely reckless in not knowing that the LOI/purchase order was not legitimate, that the Distributor did not accept the LOI/purchase order, and that the LOI/purchase order could not generate any revenue for Agent. Yet, neither Ballout nor Enerkon disclosed these material facts in the May 11, 2021 press release or any subsequent press release or public filings.

### iii.   *Ballout Made False and Misleading Statements and Omissions in an Enerkon Press Release Concerning a Power Plant that Enerkon Allegedly Planned to Build.*

33.     On May 3, 2021, Enerkon issued a press release—which Ballout authored and approved—quoting Ballout as stating, "[t]oday, [Enerkon] is pleased to announce the Signed Agreement to Purchase of 122 Acres [sic] of Commercial Land in Pennsylvania Turnpike area for

the establishment of our planned 20 MW Solar and Hydrogen Plant facility." This press release was false and misleading.

34.     The "Commercial Land" referenced in the press release was actually zoned residential, not commercial. According to the Zoning Officer for Penn Forest Township, Pennsylvania, where the land was located, the Township never received any correspondence, re-zoning applications, or other documents from Enerkon relating to any plan to build an energy plant there. Enerkon also lacked the funds to build a 20 MW solar and hydrogen plant. In addition, Enerkon never paid the landowner anything, according to the landowner.

35.     The May 3, 2021 press release also included a picture purporting to depict Enerkon's future solar and hydrogen plant. As presented and captioned, the picture gives the false and misleading impression of an actual plant that Enerkon had plans to build. In reality, the picture in the press release depicts a plant located in Japan that is one of the world's largest hydrogen-producing facilities—a fact that is not disclosed in the press release or any of Enerkon's other public filings.

36.     Ballout knew or was severely reckless in not knowing that the May 3, 2021 press release contained the false and misleading statements described in paragraphs 33-35 above. He also knowingly or severely recklessly failed to disclose the material facts described in paragraphs 33-35 above in the May 3, 2021 press release or any other public filing or statement.

### iv.  Statements Concerning Enerkon's Financial Condition

37.     Ballout caused Enerkon to report on its balance sheet in its OTC Disclosures and Financial Statements that Enerkon had millions in "Cash." For example, Enerkon's balance sheet included in its June 30, 2018 OTC Disclosure reported more than $65 million in "Cash."

11

38.     At the time of these statements and disclosures, Enerkon never had more than $100 cash in its bank account. Ballout testified that the cash balance described above was deferred (or unearned) revenue. But Enerkon's financial statements and OTC Disclosures did not disclose that the reported cash balance described above was either deferred or unearned.

39.     As further discussed below, Fielding purportedly made a $180,000 loan to Enerkon pursuant to a convertible promissory note dated and signed by Ballout, on behalf of Enerkon, on November 30, 2017. In 2021, Fielding converted the note to Enerkon stock, which he sold for a profit of at least $407,000. However, certain of Enerkon's OTC Disclosures and Financial Statements after the note was purportedly signed by Ballout in November 2017 do not disclose Fielding's purported $180,000 loan or his convertible promissory note. For example, Enerkon's December 31, 2018 OTC Disclosure and its June 30, 2019 Quarterly OTC Disclosure—both of which Ballout signed and approved—do not disclose the loan or note. In Enerkon's September 30, 2019 Quarterly OTC Disclosure—which Ballout signed and approved—Enerkon publicly disclosed the purported loan and note.

40.     Ballout's false and misleading statements and omissions were material. They created false and misleading impressions about Enerkon's financial condition and lucrative business opportunities that did not actually exist.

41.     Zayed knowingly or severely recklessly engaged in one or more deceptive acts in furtherance of Ballout's scheme to artificially inflate the price of Enerkon's stock. For example, Zayed knew, or was severely reckless in not knowing, that at least the March 9, 2021 and May 11, 2021 press releases were false and misleading. On March 17, 2021, a Distributor executive copied Zayed on the email to Ballout referenced in paragraph 24 above stating that Agent did not own any distribution rights to the Covid-19 test, as represented in the March 9, 2021 release.

Subsequently, as discussed in paragraphs 29-32 above, Zayed created a website for a fictitious NGO in the Dominican Republic, fabricated a bogus LOI, and emailed the bogus LOI to the Distributor in connection with the alleged purchase order touted in the May 11, 2021 release.

42.      Ballout's fraudulent scheme, and false and misleading statements and omissions, artificially inflated the price of Enerkon's stock. For example, on March 8, 2021, Enerkon's stock price closed at $0.87 per share; after the issuance of the false and misleading press release on March 9, 2021, Enerkon's stock price closed at $0.93 per share, an increase of roughly 6.9%. Investors bought or sold Enerkon securities during the course of Ballout's fraudulent scheme, misstatements, and omissions, and suffered pecuniary harm as a result.

**C. Defendants Schemed to Convert a Bogus Promissory Note Issued to Fielding Into Shares of Enerkon and Sell Those Shares at Inflated Prices.**

43.      Between at least May 2019 and June 2021, in coordination with Ballout's scheme to pump Enerkon's stock price, Defendants engaged in a fraudulent scheme to: (1) create a bogus promissory note purportedly issued by Enerkon to Fielding, (2) convert that bogus note to shares of Enerkon stock, and (3) sell those shares to a third party at inflated prices.

44.      The bogus note was purportedly issued as consideration for a $180,000 loan that Fielding allegedly made to Enerkon on or before November 30, 2017. The note, which identifies Fielding as the creditor and Enerkon as the debtor, was purportedly signed by Ballout on behalf of Enerkon on November 30, 2017. The note provided that Enerkon was obligated to repay Fielding the principal sum of $180,000 on or before November 30, 2018. Should Enerkon fail to timely repay Fielding in full, the note gave Fielding the right to convert the note to a designated number of shares of Enerkon stock.

45.      However, the note was created in furtherance of the fraudulent scheme. Fielding did not loan Enerkon $180,000 on or before November 30, 2017 or at any other time. The note

was also backdated. It appears that the note was actually created and signed on or about May 9, 2019, when Fielding received an email from an "Enerkon International" email address attaching the "FINAL SIGNED" promissory note. Ballout purportedly signed the note as Enerkon's "Chairman" on November 30, 2017, but in fact, he did not become affiliated with Enerkon until February 2018—more than two months after the date he purportedly signed the note. Also, in Enerkon's September 30, 2019 Quarterly OTC Disclosure, Enerkon publicly disclosed the purported loan and note. But Enerkon's OTC Disclosures prior to September 30, 2019 do not disclose or mention the purported note and loan. That includes, for example, Enerkon's December 31, 2018 OTC Disclosure and its June 30, 2019 Quarterly OTC Disclosure, neither of which disclosed the purported loan and note.

46.     Fielding subsequently took steps to convert the bogus note into shares of Enerkon stock. On March 20, 2021, Enerkon's transfer agent received documents relating to the conversion of Fielding's bogus promissory note from Fielding's email account. Attached to that email were documents purporting to be evidence of the alleged $180,000 loan to Enerkon, including (a) an invoice Enerkon purportedly issued to Fielding for three payments totaling $180,000, and (b) Fielding's purported bank account statement, which listed three payments to Enerkon in October 2017 totaling $180,000, consistent with the Enerkon invoice. However, Fielding's bank statement was fabricated. His actual bank statement from this period does not reflect these three payments. In truth, Fielding never paid $180,000 to or on behalf of Enerkon in or around October 2017, and the statement that was sent to Enerkon's transfer agent from Fielding's email account supporting his request to obtain Enerkon shares was fabricated.

47.     In the March 20, 2021 email to Enerkon's transfer agent from Fielding's email account, a Debt Conversion Notice and Seller's Representation Letter were attached, both of which

Fielding signed. The Debt Conversion Notice falsely represented that the bogus promissory note was entered into in November 2017. The Seller's Representation Letter falsely represented that the note was entered into in November 2017 and that Fielding's shares were acquired through a loan to Enerkon that, in fact, he never made.

48.     Ballout acted knowingly or with severe recklessness in furtherance of the bogus note scheme. For example, Ballout executed the bogus promissory note as Chairman of Enerkon, even though the note was backdated and, as of the purported date of the note (November 30, 2017), he had no affiliation with Enerkon or authority to issue a promissory note on Enerkon's behalf. On or around March 20, 2021, Ballout emailed Enerkon's transfer agent and attached a March 19, 2021 "Issuance Resolution" (which he signed as "CEO" of Enerkon) falsely representing that the promissory note was issued to Fielding on November 30, 2017.

49.     On or around May 11, 2021, Ballout emailed Enerkon's transfer agent and wrote in the subject line: "Final conversion of Note for Fielding documents attached as per his request and our permission." Ballout attached to that email to the transfer agent, among other things, the bogus note as well as an Enerkon Board Resolution and Debt Conversion Notice, both of which were dated May 9, 2021, signed by Ballout, and falsely represented that on November 30, 2017 the bogus note was issued to Fielding and that Enerkon incurred the underlying debt.

50.     Likewise, Zayed acted knowingly or with severe recklessness, in coordination with Fielding and Ballout, in furtherance of Defendants' bogus promissory note scheme. Fielding testified that he believed Zayed prepared at least some of the documents that Fielding sent to Enerkon's transfer agent in connection with the conversion of the bogus promissory note. Similarly, emails between Zayed and Fielding further indicate that Zayed prepared—or directed lawyers or other professionals to prepare—other documents in connection with Fielding's

15

conversion of the bogus promissory note and sales of Enerkon shares, including but not limited to legal opinions, affidavits, letters, and agreements. Zayed sent those documents to Fielding for his review, approval, and, when necessary, his signature.

51.     As a further example of Zayed's involvement, Zayed emailed Fielding on or around January 10, 2021 to provide Fielding with a status report on the conversion of the bogus promissory note to Enerkon shares. Zayed listed a number of steps that were either planned or completed to effectuate the conversion, including the issuance of an Enerkon "corporate resolution last year dated to comply with the holding period" and documents that needed to be prepared and sent to the transfer agent. He also advised Fielding about the timing of when they should try to sell Fielding's Enerkon shares to maximize their return. Following this update and list of next steps, Zayed told Fielding that once they finished their current set of transactions, then "we will get MORE free shares from BEN [Ballout] then after that and DO IT AGAIN …."

52.     As a result of the documents sent to Enerkon's transfer agent discussed in paragraphs 46-49 above, Fielding successfully converted the bogus promissory note to at least 9,000,000 unrestricted shares of Enerkon stock.

53.     Ballout and Zayed then negotiated the sale of Fielding's stock with a third-party investor who purchased the shares.  For example, on February 24, 2021, Ballout emailed the third-party investor, thanking the investor for the offer to Fielding, but noting that he "would be insulting him [Fielding]" if he shared it with Fielding. On March 5, 2021, Zayed—holding himself out as an advisor to Fielding and Enerkon—emailed the third-party investor and conveyed that Fielding wanted to wait to sell his Enerkon stock until there were "better market conditions." Just days later—on March 9, 2021— Enerkon issued the press release announcing the distribution rights purportedly owned by Agent, discussed in paragraphs 22-25 above.

16

54.     Weeks later, between May 19, 2021 and May 27, 2021, Fielding sold his Enerkon shares to that same third-party investor at prices inflated by the false and misleading statements and omissions discussed in paragraphs 17-42 above, receiving a total profit of $407,000.

55.     Before the sale, Fielding agreed to provide Zayed a share of the sales proceeds. True to his word, Fielding sent Zayed $96,000 from the sales proceeds following the sale.

56.     Fielding also entered into an agreement with a third-party investor on or about June 7, 2021 to sell additional Enerkon shares for $569,000, but it does not appear that he received payment pursuant to this agreement.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)]**
*(Against All Defendants)*

57.     The SEC re-alleges and incorporates paragraphs 1-56 above by reference as if fully set forth hereunder.

58.     By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 13-56 above, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

59.     With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly or with severe recklessness. With regard to the violations of Section 17(a)(3), Defendants acted at least negligently.

60.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]
### *(Against Zayed and Fielding)*

61.     The SEC re-alleges and incorporates paragraphs 1-56 above by reference as if fully set forth hereunder.

62.     By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 13-56 above, Defendants Zayed and Fielding, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     With regard to the violations of Section 17(a)(2), Zayed and Fielding acted at least negligently.

64.     By reason of the foregoing, Defendants Zayed and Fielding have violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]
### *(Against All Defendants)*

65.     The SEC re-alleges and incorporates paragraphs 1-56 above by reference as if fully set forth hereunder.

66.     By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 13-56 above, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

67.     With regard to the violations of Section 10(b) and Rules 10b-5(a) and (c), Defendants acted with scienter and engaged in the referenced acts knowingly or with severe recklessness.

68.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]**
*(Against Ballout and Fielding)*

69.     The SEC re-alleges and incorporates paragraphs 1-56 above by reference as if fully set forth hereunder.

70.     By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 13-56 above, Defendants Ballout and Fielding, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange made untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     With regard to the violations of Section 10(b) and Rule 10b-5(b), Ballout and Fielding acted with scienter and engaged in the referenced acts knowingly or with severe recklessness.

72.     By reason of the foregoing, Defendants Ballout and Fielding have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**VII.    PRAYER FOR RELIEF**

73.     WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

•     Permanently restraining and enjoining Ballout from violating, directly or indirectly, Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

•     Permanently restraining and enjoining Zayed from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder;

•     Permanently restraining and enjoining Fielding from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

•     Permanently restraining and enjoining Ballout, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer

or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining Defendants, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)], from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1];

- Ordering Fielding and Zayed to disgorge all ill-gotten gains they received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act;

- Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.   <u>JURY DEMAND</u>

74.     The SEC demands trial by jury in this action on all issues so triable.

Dated:  September 23, 2024                 Respectfully submitted,

/s/ *Patrick Disbennett*_____
Patrick Disbennett
S.D. Fla. Special Bar ID A5503234
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: (817) 266-9633 (Disbennett)
disbennettpa@sec.gov

*Attorney for Plaintiff*